## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES KING, | |
| Petitioner, | CIVIL ACTION NO. 3:15-CV-01937 |
| v. | (NEALON, J.) |
| WARDEN DAVID EBBERT, | (MEHALCHICK, M.J.) |
| Respondent. | |
| JAMES KING, | |
| Petitioner, | CIVIL ACTION NO. 3:15-CV-02483 |
| v. | (NEALON, J.) |
| WARDEN DAVID EBBERT, | (MEHALCHICK, M.J.) |
| Respondent. | |
| JAMES KING, | |
| Petitioner, | CIVIL ACTION NO. 3:16-CV-00953 |
| v. | (NEALON, J.) |
| WARDEN DAVID EBBERT, | (MEHALCHICK, M.J.) |
| Respondent. | |
| JAMES KING, | |
| Petitioner, | CIVIL ACTION NO. 3:16-CV-01863 |
| v. | (NEALON, J.) |
| WARDEN DAVID EBBERT, | (MEHALCHICK, M.J.) |
| Respondent. | |

## REPORT AND RECOMMENDATION

The Court has received and filed a series of four petitions for a writ of habeas corpus submitted pursuant to 28 U.S.C. § 2241, each signed and dated by the Petitioner, James King. The first petition, Case No. 3:15-CV-01937 (Petition 1), was filed by the Court on October 6, 2015 and dated by King on September 23, 2015. (Petition 1, Doc. 1). The second petition, Case No. 3:15-CV-02483 (Petition 2), was filed by the Court on December 28, 2015 and dated by King on December 21, 2015. (Petition 2, Doc. 1). The third petition, Case No. 3:16-CV-00953 (Petition 3), was filed by the Court on May 23, 2016 and dated by King on May 15, 2016. (Petition 3, Doc. 1). The fourth and final petition, Case No. 3:16-CV-01863 (Petition 4), was filed by the Court on September 9, 2016 and dated by King on September 4, 2016. (Petition 4, Doc. 1). King is an inmate currently incarcerated at USP Lewisburg, located in Lewisburg, Pennsylvania. Because King's petitions share common legal issues and facts, the Court addresses all four petitions in this Report and Recommendation.

### I.   BACKGROUND

King is currently serving a federal sentence of 110 months' imprisonment that was imposed by the United States District Court for the Northern District of West Virginia on June 20, 2005 after King pleaded guilty to a charge of bank robbery.[1] (Petition 1, Doc. 1, ¶ 4). Each of the four petitions now before this Court stem from allegations that King's due process rights

---

[1] In addition to the petition and attached exhibits, a federal habeas court may take judicial notice of state court records, as well as its own. *Minney v. Winstead*, No. 2:12-cv-1732, 2013 WL 3279793, at *2 (W.D. Pa. June 27, 2013); *see also Reynolds v. Ellingsworth*, 843 F.2d 712, 714 n.1 (3d Cir. 1988). Accordingly, in reviewing this petition, the Court has taken judicial notice of the publicly-available dockets of King's criminal and post-conviction relief proceedings in the United States District Court for the Northern District of West Virginia and the United States Court of Appeals for the Fourth Circuit.

were violated during a series of disciplinary hearings where he was found guilty of several prohibited acts while incarcerated at USP Allenwood in White Deer, Pennsylvania, and later at USP Lewisburg, King's current place of incarceration. All four petitions were served on Respondent, who answered that King is not entitled to habeas relief because King failed to exhaust administrative remedies with regard to Petitions 3 and 4 and that the disciplinary proceedings that are the basis for Petitions 1 and 2 were conducted in accordance with due process. (Petition 1, Doc. 15; Petition 2, Doc. 10; Petition 3, Doc. 4; Petition 4, Doc. 4). King filed replies to each answer, and accordingly all four petitions are now ripe for disposition.[2]

(Petition 1, Doc. 16; Petition 2, Doc. 11; Petition 3, Doc. 5; Petition 4, Doc. 5).

A.    PETITION 1: CLAIMS OF HABEAS PETITION DOCKET NO. 3:15-CV-01937

On March 6, 2015, Incident Report No. 2690426 was issued by Lieutenant L. Powell charging King with violating Code 203 "Threatening another with bodily harm." (Petition 1, Doc. 1-1, at 1). Powell described the incident as follows:

> On March 6, 2015, at approximately 2:00 p.m., I completed a Threat Assessment on inmate King, James, Reg. No. 05005-087. Inmate King admitted to writing the ten letters included in the threat assessment. The letters are dated between December 11, 2014 and February 2, 2015. Most of the letters are addressed to "Pammy King" who is identified as Pamela Laubach . . . . Inmate King makes reference in the letter dated February 24, 2015, that he is capable of violence. He wrote multiple letters, revealing his anger at Mr. Heath DHO Cerney, the SIS department and Ms. Laubach. In the body of these letters, he uses coded messages, referring at times to "research" he assigned to his brother, Danny, and Pamela. He inferred in one letter that his brother, who lives in Pennsylvania, will do whatever he asks of him. The letters implied that King was attempting to uncover information on staff as related in the letter dated February 24, 2015, where he stated, "But to be honest, I'm not appealing anymore. After I got all

---

[2] King additionally filed motions to conduct discovery with respect to two of his four petitions. (Petition 1, Doc. 9; Petition 2, Doc. 4); *see* Rule 6, 28 U.S.C. foll. § 2254 (permitting judges to authorize parties to conduct discovery in federal habeas cases). These two motions will also be addressed in this Report and Recommendation.

the information on fat ass and his two cronies, I'm gonna get justice my own way." It can be concluded that an underlying theme of the letters was to gather information on staff, in order for King to "get justice" his own way. King is not referring to the administrative remedy process as he specifically stated, "I'm not appealing it anymore." Due to the fact that inmate King has ties to family and friends in several local communities, it can be concluded that this is a viable threat.

(Petition 1, Doc. 1-1, at 1).

The incident was initially referred to the Federal Bureau of Investigations ("FBI") for possible prosecution, which the FBI declined on March 8, 2015. (Petition 1, Doc. 15-1, at 9). King was then provided a copy of the incident report and advised of his right to remain silent, which he exercised. (Petition 1, Doc. 1-1, at 2). An initial hearing was held before the Unit Disciplinary Committee (UDC) on March 9, 2015, at which time the UDC chose to refer the incident report to the Discipline Hearing Officer (DHO). (Petition 1, Doc. 15-1, at 9). The UDC recommended sanctions against King that included the loss of good conduct time and six months' loss of commissary and phone privileges. (Petition 1, Doc. 15-1, at 9).

At the conclusion of the UDC hearing, King was provided "Notice of Discipline Hearing before the DHO" and "Inmate Rights at Discipline Hearing" forms, which King signed to indicate that he had been advised of his rights.[3] (Petition 1, Doc. 15-1, at 11-12).

---

[3] The DHO hearing rights that King was advised of included:

1. The right to have a written copy of the charge(s) against [him] at least 24 hours prior to appearing before the [DHO];
2. The right to have a full-time member of the staff who is reasonably available to represent [him] before the [DHO];
3. The right to call witnesses (or present written statements of unavailable witnesses) and to present documentary evidence in [his] behalf, provided institutional safety would not be jeopardized;

*(footnote continued on next page)*

Additionally, King indicated that he did not wish to call witnesses for the DHO hearing but did request assistance from a staff representative. (Petition 1, Doc. 1-1, at 2).

The DHO hearing was held on March 11, 2015. (Petition 1, Doc. 1-1, at 2). Mr. F. Passaniti was appointed as a staff representative on King's behalf. (Petition 1, Doc. 1-1, at 2). The DHO report notes that Passaniti was provided all documents that the DHO considered in reaching its decision, including: an inmate threat assessment; an inmate investigative report; reports and copies of King's e-mails, letters, and other communications; King's visitor list; the incident report; and a copy of Freedom of Information Act requests involving King. (Petition 1, Doc. 1-1, at 2-3). Furthermore, the DHO report states that King was advised of his rights at the onset of the hearing, indicated that he understood them, and chose not to present witnesses or documentary evidence or raise any procedural challenges. (Petition 1, Doc. 1-1, at 2). King did, however, provide a brief statement in which he claimed that excerpts of his outgoing letters were taken out of context to create the impression that he was threatening prison staff, and that his reference to numbered "garage doors" in the letters was just an innocuous code for the

---

4. The right to present a statement or to remain silent. [His] silence may be used to draw an adverse inference against [him]. However, [his] silence alone may not be used to support a finding that [he] committed a prohibited act;

5. The right to be present throughout the discipline hearing except during a period of deliberation or when institutional safety would be jeopardized. If [he] elect[s] not to appear before the DHO, [he] may still have witnesses and a staff representative appear on [his] behalf;

6. The right to be advised of the DHO's decision, the facts supporting that decision, except where institutional safety would be jeopardized, and the DHO's disposition in writing; and,

7. The right to appeal the decision of the DHO by means of the Administrative Remedy Procedure to the Regional Director within 20 calendar days of the DHO's decision and disposition.

(Petition 1, Doc. 15-1, at 12).

various letters themselves. (Petition 1, Doc. 1-1, at 2).

After reviewing the documentary evidence and considering King's statement, the DHO found "the misconduct and charge to be best supported as [C]ode 296 (Misuse of the mail)." (Petition 1, Doc. 1-1, at 4). The DHO reached its conclusion by reasoning that a Code 296 violation is supported by the weight of the evidence and King's own admission that he wrote in code. (Petition 1, Doc. 1-1, at 4). Additionally, the DHO noted that a Code 296 violation is of the same severity level as the Code 203 violation that King was initially charged with in the incident report, and that the incident report contained sufficient facts to also support a Code 296 violation. (Petition 1, Doc. 1-1, at 4). The DHO imposed the following sanctions on King: (1) disallowance of 27 days good conduct time; (2) forfeiture of 43 days non-vested good conduct time; (3) 60 days disciplinary segregation (suspended for 180 days pending no other misconduct); (4) 18 months loss of phone and email privileges; and (5) a $171.00 fine that King refused to pay. (Petition 1, Doc. 1-1, at 4). The DHO's written decision was issued on March 13, 2015, and a copy of the report was delivered to King on March 17, 2015. (Petition 1, Doc. 1-1, at 4).

Prison staff informed King of his appeal rights upon delivering the DHO's written decision. (Petition 1, Doc. 1-1, at 4). King filed an appeal of the DHO's decision to the Regional Director on March 27, 2015, Administrative Remedy Identification No. 816351-R2, in which he argued that he was denied due process during the DHO hearing because he had no opportunity to put on a defense against the Code 296 charge. (Petition 1, Doc. 1-1, at 5). Specifically, King claimed that: (1) the elements of a Code 296 charge were markedly different from those of a Code 203 charge that he presumed he would be facing; (2) the Code 296 charge was never mentioned in the incident report or considered by the UDC; (3) he was denied the

opportunity to present witnesses as to the Code 296 charge; (4) he successfully defended against the Code 203 charge; and (5) the term "garage door" is merely a nickname as opposed to a code. (Petition 1, Doc. 1-1, at 5). On May 14, 2015, the Regional Director denied King's appeal, noting that "Program Statement 5270.09, Inmate Discipline, states the DHO shall consider all evidence presented at the hearing and find that the inmate committed the prohibited act charged and/or a similar prohibited act if reflected in the incident report or did not commit the prohibited act charged." (Petition 1, Doc. 1-1, at 6); *see also* 28 C.F.R. § 541.8(a)(1). The Regional Director further reasoned that there was sufficient evidence in the incident report to support the DHO's finding that King violated Code 296, and therefore the DHO substantially complied with Program Statement 5270.09. (Petition 1, Doc. 1-1, at 6).

The Regional Director's response also informed King of his right to appeal the decision to the General Counsel at Federal Bureau of Prisons ("BOP") Central Office. (Petition 1, Doc. 1-1, at 6). King contends—and Respondent concedes—that he properly exhausted administrative remedies by filing a timely appeal to the Central Office on June 15, 2015. (Petition 1, Doc. 1, ¶ 8; Petition 1, Doc. 1-1, at 7; Petition 1, Doc. 15, at 7 n.1). After waiting for over three months without a response from the Central Office, King filed the instant habeas petition, 3:15-CV-01937, received and filed by this Court on October 6, 2015. (Petition 1, Doc. 1).

B.    PETITION 2: CLAIMS OF HABEAS PETITION DOCKET NO. 3:15-CV-02483

On October 22, 2014, Incident Report No. 2642511 was issued by Special Investigative Agent ("SIA") C. Heath charging King with violations of Code 111 "Introduction of narcotics" and Code 196 "Use of the mail for illegal purposes." (Petition 2, Doc. 1, at 12). Heath described the incident as follows:

On August 4, 2014, mail room staff at USP Allenwood discovered four (4) strips of a substance concealed inside an envelope addressed to inmate David Jones . . . , which tested positive for Buprenorphine (Suboxone), a schedule 3 narcotic. A subsequent SIS investigation concluded the strips of Suboxone intercepted by mail room staff on August 4, 2014, were intended for inmate Jones. Inmate Jones was knowingly involved in a large narcotic introduction scheme at USP Allenwood, orchestrated by inmate James King . . . . King's accomplice and approved visitor, Pam Laubach, sent multiple envelopes containing Suboxone strips in to inmate Jones over a period of several months. Jones would give the strips of Suboxone to inmate King upon receipt. Inmate Jones was paid for each envelope he received and turned over to King. King sold the strips of Suboxone to several white inmates from Boston. Inmate Jason Brown . . . from Boston, lived in the same unit as King, Unit 1B. King handed the Suboxone over to Brown, who would distribute the Suboxone to other Boston inmates. In Unit 3A, inmate Jayson Paradise . . . from Boston, was the recipient of Suboxone from Brown. Paradise would sell Suboxone to inmates in Unite 3A and on the yard. Inmate(s) in Unit 3A were found to have used Suboxone. When inmate Brown went to SHU for the use of narcotics, inmate Stephen Rossetti . . . , who was assigned to the same cell as King and is from Boston, stepped in and filled Brown's role of getting the Suboxone from King and delivering it to Paradise and other Boston inmates. Inmate King was also having money sent, by other inmates to pay for Suboxone, to a Post Office Box in Washingtonville, PA. Inmate King asked his visitor, Pam Laubach to establish the Post Office Box, so funds could be sent by third parties to pay for Suboxone sold to inmates at USP Allenwood. Inmate King directed money orders to be sent to this Post Office Box by other inmates and their families. Pam Lauback admitted to receiving approximately $1800.00, $900.00 in Laubach's name and $900.00 in Sally Biedrzycki's name. Biedrzycki produced receipts totaling $1300.00. Laubach admitted King asked her to use another person's name on the money orders, to "protect" Laubach.

(Petition 2, Doc. 1, at 12).

King was provided a copy of the incident report on the day it was issued. (Petition 2, Doc. 1, at 12). The incident was also referred to the FBI, which accepted the case for prosecution. (Petition 2, Doc. 10-1, at 4-5). On November 17, 2014, after the FBI's decision, prison staff continued with the disciplinary process by advising King of his rights and offering him the opportunity to provide a statement. (Petition 2, Doc. 10-1, at 4). King chose to remain silent at that time. (Petition 2, Doc. 10-1, at 4). Lieutenant P. Newton, the investigating officer, then referred the incident report to the UDC for an initial hearing. (Petition 2, Doc. 10-1, at 4).

The UDC conducted an initial hearing on November 18, 2014, at which time King again was advised of his rights and declined to provide a statement. (Petition 2, Doc. 10-1, at 5). The UDC referred the incident report to the DHO, recommending sanctions against King that included 90 days disciplinary segregation, loss of good conduct time, and loss of commissary and phone privileges. (Petition 2, Doc. 10-1, at 5). At the conclusion of the UDC hearing, King was provided "Notice of Discipline Hearing before the DHO" and "Inmate Rights at Discipline Hearing" forms, which King signed to acknowledge that he had been advised of his rights. (Petition 2, Doc. 10-1, at 6-7). King requested the assistance of staff representative C. Johnson and also indicated that he wished to call inmates Jason Brown, David Jones, Jayson Paradise, and Stephen Rossetti as witnesses. (Petition 2, Doc. 10-1, at 7).

The DHO hearing was held on December 10, 2014. (Petition 2, Doc. 1, at 13). Johnson, serving as King's staff representative, noted that he was provided all documents that were before the DHO for consideration at the hearing, met with King prior to the hearing to discuss strategy and learned that King wished to ask a series of questions about the evidence against him—most of which dealt with alleged confidential informants that King believed had offered testimony against him. (Petition 2, Doc. 1, at 13, 19-66). The documentary evidence Johnson was provided included: an inmate investigative report; memorandums from prison staff members F. Ortiz and M. Butler; Trulincs contact searches for inmates B. Chapman and D. Fordham; and photocopies of postal money orders for Sally Biedrzycki. (Petition 2, Doc. 1, at 14). Johnson also noted that he felt there were no discrepancies in the disciplinary process. (Petition 2, Doc. 1, at 13).

At the hearing, King provided a statement in which he denied any involvement with drugs, noted that most of the receipts presented as evidence against him were dated before

inmate Jones arrived at USP Allenwood, claimed that the money was sent in Biedrzycki's name because his girlfriend, Pam Laubach, was nervous about other people sending her money, and stated that he used the money to pay debts under the Inmate Financial Responsibility Program ("FRP"). (Petition 2, Doc. 1, at 13); *see also* 28 C.F.R. § 545.10-11. Additionally, the four inmates that King wished to call on his behalf each appeared and stated that they had no knowledge of King ever being involved with drugs. (Petition 2, Doc. 1, at 14).

Despite King's statement and the witnesses presented on his behalf, the DHO found that the greater weight of the evidence supported a finding that King violated Code 111 "Introduction of narcotics."[4] (Petition 2, Doc. 1, at 16). In reaching this conclusion, the DHO cited the memorandums provided by prison staff members F. Ortiz and M. Butler, who intercepted the suspicious mail from Laubach addressed to inmate Jones and then tested the strips found inside to confirm that they consisted of Suboxone. (Petition 2, Doc. 1, at 15). SIA Heath then began an investigation, which led him to interview Laubach and learn that she sent the envelopes and received money on King's behalf. (Petition 2, Doc. 1, at 15). Specifically, Laubach admitted that she sent the envelope addressed to Jones that prison staff intercepted, but denied knowing of its contents because King discouraged her from asking any questions about the operation. (Petition 2, Doc. 1, at 15-16). She received the pre-sealed envelopes containing Suboxone from an unknown sender who she believed may be an associate of King's, along with mailing instructions for who to send the envelope to. (Petition 2, Doc. 1, at 16). The DHO found Laubach's testimony to be highly credible due to the level of detail she provided as to King's alleged drug smuggling operation. (Petition 2, Doc. 1, at 16). On the other hand, the

---

[4] The DHO appears to have dropped the Code 196 charge for "Use of the mail for illegal purposes."

DHO did not find the testimony offered by King and the inmates who spoke on his behalf to be credible, reasoning that it would be implausible for King not to know that his girlfriend was smuggling contraband into the prison. (Petition 2, Doc. 1, at 16). The DHO further noted that the questions King wanted Johnson to ask about confidential informants were irrelevant because the DHO did not rely on any confidential information or testimony in rendering its decision. (Petition 2, Doc. 1, at 16). As a final matter, the DHO pointed out that King's credibility also was undermined by the fact that he appeared to change his story towards the end of the hearing, indicating for the first time that he agreed to have "something" mailed into the prison on behalf of another unnamed inmate without knowing what it was. (Petition 2, Doc. 1, at 16). The following sanctions were imposed on King by the DHO: (1) disallowance of 40 days good conduct time; (2) forfeiture of 76 days non-vested good conduct time; (3) 90 days disciplinary segregation; (4) 9 months loss of commissary and email privileges; and (5) 12 months loss of visitation privileges, to be followed by an additional 12 months of non-contract visitation. (Petition 2, Doc. 1, at 16). The DHO's written decision was issued on December 16, 2014, and King received a copy of the report and was advised of his appeal rights the following day. (Petition 2, Doc. 1, at 17).

King filed an appeal of the DHO's decision to the Regional Director on December 30, 2014, Administrative Remedy Identification No. 806666-R1, in which he challenged the DHO's findings as unsupported by the evidence, or alternatively, reliant on new evidence that King did not have an opportunity to review beforehand. (Petition 2, Doc. 1, at 18). King maintained his defense that he could not have run a prolonged drug smuggling operation because inmate Jones, the intended recipient of the intercepted envelope, had only recently arrived at USP Allenwood. (Petition 2, Doc. 1, at 62). In addition to his appeal form, King

attached 48 pages of exhibits, which mostly consisted of the series of questions that King had Johnson ask on his behalf about alleged confidential informants and the evidence against him, along with the purported answers to those questions given at the hearing. (Petition 2, Doc. 1, at 18-66).

On May 22, 2015, the Regional Director denied King's appeal, characterizing the appeal as primarily a challenge to the credibility of the information contained in the incident report. (Petition 2, Doc. 1, at 67). The Regional Director noted, however, that King had the opportunity to present his own evidence to the DHO and that the DHO ultimately determined the evidence presented by the prison staff to be more credible. (Petition 2, Doc. 1, at 67). For instance, the Regional Director pointed out that the series of questions and answers that King attached as an exhibit was never made part of the administrative record before the DHO. (Petition 2, Doc. 1, at 67). Because the Regional Director concluded that the DHO's decision was based upon the greater weight of the evidence presented at the hearing, King's appeal was denied. (Petition 2, Doc. 1, at 67). As a final matter, the Regional Director informed King of his right to appeal the decision to the BOP's Central Office. (Petition 2, Doc. 1, at 67).

King contends that he properly exhausted administrative remedies with regard to this claim by filing a timely appeal to the Central Office on June 15, 2015. (Petition 2, Doc. 1, ¶ 8). After waiting for approximately six months without a response from the Central Office, King filed the instant habeas petition, 3:15-CV-02483, which was received and filed by this Court on December 28, 2015. (Petition 2, Doc. 1). Respondent does not challenge King's assertion that he properly exhausted administrative remedies with respect to Petition 2. (Petition 2, Doc. 10).

C.     PETITION 3: CLAIMS OF HABEAS PETITION DOCKET NO. 3:16-CV-00953

On December 24, 2014, Incident Report No. 2664375 was issued by Lieutenant S.

12

Tyson charging King with a violation of Code 201 "Fighting with another person." (Petition 3, Doc. 1, at 11). Tyson described the incident as follows:

> On December 23, 2014, at approximately 10:25 p.m., I was notified by Special Housing Unit staff, that there had been a fight in A-Range Cell 122. Upon my arrival to the unit, I was informed that the inmates who were involved in the altercation were inmate Elswick, Joshua . . . and inmate King, James . . . . Both inmates were interviewed, and admitted to be involved in a physical altercation. The inmates were medically assessed and photographed. Inmate Elswick was noted to have a cut next to his right eye. Inmate King sustained a small hematoma below his right eye. An investigation concluded inmates Elswick and King were involved in a cell fight in A-Range, cell 122. The fight was not witnessed by staff.

(Petition 3, Doc. 1, at 11).

King was provided a copy of the incident report on the day it was issued. (Petition 3, Doc. 1, at 11). At that time, King was also read his rights and declined the opportunity to provide a statement. (Petition 3, Doc. 4-1, at 37). Lieutenant S. Hock, the investigating officer, then referred the matter to the UDC for an initial hearing. (Petition 3, Doc. 4-1, at 37).

The UDC conducted an initial hearing on December 29, 2014, at which time King again was advised of his rights and offered a statement denying that inmate Elswick ever touched him. (Petition 3, Doc. 4-1, at 38). The UDC referred the incident report to the DHO, recommending sanctions against King that included 60 days disciplinary segregation, loss of good conduct time, and loss of commissary and phone privileges. (Petition 3, Doc. 4-1, at 38). At the conclusion of the UDC hearing, King was provided "Notice of Discipline Hearing before the DHO" and "Inmate Rights at Discipline Hearing" forms, which King signed to acknowledge that he had been advised of his rights. (Petition 3, Doc. 4-1, at 46-47). King indicated that he did not wish to have the assistance of a staff representative or to call witnesses to testify on his behalf. (Petition 3, Doc. 4-1, at 47).

The DHO hearing was held on January 7, 2015. (Petition 3, Doc. 1, at 13). At the

hearing, King provided a statement in which he denied that a fight ever occurred. (Petition 3, Doc. 1, at 12). In addition to King's statement, the DHO also considered the following documentary evidence: memorandums provided by prison staff members S. Tyson, J. Gosciminski, E. Stevens, and T. Rung; photographs taken of King and Elswick after the alleged fight; and the BOP health services clinical encounter reports for both King and Elswick. (Petition 3, Doc. 1, at 12). After reviewing the evidence, "the DHO amended the fighting charge to that of Code 224, Assault." (Petition 3, Doc. 1, at 13). In reaching this conclusion, the DHO noted that there was ample evidence of King assaulting Elswick given the documented bleeding from an abrasion above Elswick's right eye, King's alleged statement to Lieutenant Tyson that "[i]t happened, it's over and it's all good," and Elswick's own admission that some sort of physical altercation occurred. (Petition 3, Doc. 1, at 13). Nonetheless, the DHO found little basis to conclude that the hostilities were mutual, given the lack of injury suffered by King. (Petition 3, Doc. 1, at 13). The DHO further reasoned that King's statement at the hearing that "[t]here was no fight" and Elswick's admission to Tyson that some sort of altercation occurred could be mutually reconciled through the conclusion that King committed an assault without Elswick necessarily fighting back. (Petition 3, Doc. 1, at 13). The DHO imposed sanctions on King that included disallowance of 27 days good conduct time and 30 days of disciplinary segregation. (Petition 3, Doc. 1, at 14). The DHO's written decision was issued on January 15, 2015, and King received a copy of the report and was advised of his appeal rights the following day. (Petition 3, Doc. 1, at 14).

King filed an appeal of the DHO's decision to the Regional Director on January 21, 2015, Administrative Remedy Identification No. 809782-R1. (Petition 3, Doc. 1, at 2, 15). King alleges that he received no response to this appeal, despite numerous attempts through family

members to contact the Regional Director.[5] (Petition 3, Doc. 1, at 2, 16). Respondent, on the other hand, contends that King's appeal to the Regional Director was denied on March 4, 2015. (Petition 3, Doc. 4-1, at 16). King eventually filed an appeal to the Central Office on September 9, 2015, Administrative Remedy Identification No. 809782-A1, approximately seven months after filing his initial appeal with the Regional Director. (Petition 3, Doc. 1, at 3; Petition 3, Doc. 5, at 22-23). On October 7, 2015, the Central Office rejected this appeal because King failed to attach copies of his appeal to the Regional Director and the Regional Director's response. (Petition 3, Doc. 1, at 17; Petition 3, Doc. 5, at 24). Nonetheless, King was permitted to resubmit his appeal to the Central Office within 15 days with the requested documentation included. (Petition 3, Doc. 1, at 17). Respondent further indicates that King refiled his appeal to the Central Office on October 19, 2015, Administrative Remedy Identification No. 809782-A2, but this appeal was rejected both for failing to include the requested documentation and as untimely, on November 12, 2015. (Petition 3, Doc. 4-1, at 22; Petition 3, Doc. 5, at 26). King was given an additional opportunity to resubmit his appeal to the Central Office, along with an explanation as to why his appeal was untimely, but it appears that he never took this step. (Petition 3, Doc. 4-1, at 22-32; Petition 3, Doc. 5, at 26). Rather than resubmitting his appeal as instructed, King filed the instant habeas petition, 3:16-CV-00953, which was received and filed by this Court on May 23, 2016. (Petition 3, Doc. 1).

D.   PETITION 4: CLAIMS OF HABEAS PETITION DOCKET NO. 3:16-CV-01863

On November 20, 2015, while King was incarcerated at USP Lewisburg, Incident

---

[5] In his reply to Respondent's answer, King infers that he may not have received the Regional Director's response because he was transferred from USP Allenwood to USP Lewisburg during the same week that the response was issued. (Petition 3, Doc. 5, at 2).

Report No. 2785471 was issued by SIA S. Heath charging King with violations of Code 203

"Threatening another with bodily harm" and Code 296 "Unauthorized use of the mail."[6]

(Petition 4, Doc. 1, at 12; Petition 4, Doc. 4-1, at 35). SIA S. Heath observed that she reviewed

an outgoing letter that morning from King to Tiffany King of Cranberry Township,

Pennsylvania. The incident report quotes portions of King's letter as follows:

> So when I was at Allenwood USP I had a SIA cop fuck with me like you
> wouldn't believe. I never did nothing to this cocksucker but he went at me full
> tilt . . . but those letters are extremely important to me. Some of my most
> valuable possessions. And this faggot cocksucker goes in my cell, says they tested
> positive for amphetamines and jams me up and sends me to the SMU. But I
> swore an oath on my baby's eyes, I'm going to make a mother-fucker pay for
> doing this to me and taking something so important to me. . . . Now so you
> know SIA is probably THE most powerful person in a jail. They can even walk
> the Warden off the yard. So the bitch sets me up, sends me to 18 months of this
> shit. . . . And I gave dude an "out." I told him to just give me the letters back or
> send them home, and he'll never have to deal with it. He refused. See these
> people get comfortable disrespecting people. Those papers are so important to
> me. Yet he has no idea what they are going to cost him. It will be great. I'm not
> the average dude. Get personal. I get personal. But it is what it is. Actions have
> consequences. . . . Want to hear a story? Okay, so I am good at what I do. Local
> police ain't got a shot in hell at catching me. So BCI steps in (Bureau of Criminal
> Investigations) and don't worry, I have TONS of stories like this I can't tell. This
> one I can cause my rappy told about it. I normally would do these kinds of things
> by myself but what I wanted to do required a team. So this cop. He's head of the
> Western Auto Theft Task Force for the BCI. This pussy pulls my daughters
> mother over, tells her he's going to put her in jail and take our baby. Trying to
> flip her to tell on me. Little did he know she knew nothing about what I did. She
> was a mess, he made it personal. So I had my guys, and so you know I got
> MAJOR friends. People whom I didn't tell on. All I need is a plate number and
> I'll know all I need to know. So I get this pussies address, pay guys to do
> surveillance, follow any visitors, etc. Until I know everyone in his family. I had a
> lot of plans for the cocksucker. Step 1 was embarrassment. Me & the boys got a
> tip that he had surveillance set up on a tractor thinking he would try it. I had a
> guy who worked in a position to get this information. So I took a ride by, seen he
> was watching the spot, then I took a stolen truck to the field behind dude's house

---

[6] SIA S. Heath at USP Lewisburg is married to SIA C. Heath at USP Allenwood, who
brought the incident report against King that is the basis for Petition 2.  (Petition 4, Doc. 1, at
13).

and we "chopped" it. Completely dismantled it. Set it all up nice & neat then put fuck (unintelligible) in the side of the bed, then set it on fire. Right in this pussie's back yard. So now my other guys wait for him to get the call cause he's busy watching the tractor. Once he got the call & took off cause there's a stolen truck on fire at his house, my guys took the tractor. Never got any further in my plans. Got locked up.

(Petition 4, Doc. 1, at 12).

Based on this letter, SIA S. Heath concluded that King was threatening to retaliate against SIA C. Heath at USP Allenwood for having played a role in King's designation to the Special Management Unit ("SMU") program. (Petition 4, Doc. 1, at 12).

King was provided a copy of the incident report on the day it was issued. (Petition 4, Doc. 1, at 12). At that time, King was also read his rights and declined the opportunity to provide a statement. (Petition 4, Doc. 4-1, at 36). Lieutenant G. Vargeson, the investigating officer, then referred the matter to the UDC for an initial hearing. (Petition 4, Doc. 4-1, at 36). The UDC conducted an initial hearing on November 23, 2015, at which time King again declined to comment. (Petition 4, Doc. 4-1, at 37). The UDC referred the incident report to the DHO, recommending "appropriate sanctions not available to the UDC." (Petition 4, Doc. 4-1, at 37). At the conclusion of the UDC hearing, King was provided "Notice of Discipline Hearing before the DHO" and "Inmate Rights at Discipline Hearing" forms, which King refused to sign. (Petition 4, Doc. 4-1, at 38-39). A staff member instead signed the forms to indicate that King had been advised of his rights. (Petition 4, Doc. 4-1, at 38-39). King indicated that he wished to have Corrections Officer ("CO") Simmonds serve as his staff representative and that he intended to call Counselor R. Bingaman as a witness at the DHO hearing. (Petition 4, Doc. 4-1, at 38).

The DHO hearing was held on December 8, 2015. (Petition 4, Doc. 4-1, at 41). King provided a statement on his own behalf in which he denied the accusation that he threatened

SIA C. Heath and alleged that the incident report was fraudulently concocted by SIA S. Heath in retaliation for King suing her husband over another matter. (Petition 4, Doc. 4-1, at 41). Furthermore, King argued that the fact that SIA S. Heath was reporting and investigating this alleged threat against her husband created a conflict of interest. (Petition 4, Doc. 4-1, at 41). To the extent that his letter could be interpreted as a threat against SIA C. Heath, King claimed that he was merely threatening a lawsuit rather than physical harm. (Petition 4, Doc. 4-1, at 41). CO Simmonds also appeared at the hearing and noted that he had never personally seen King act in a disrespectful manner or threateningly towards a staff member or anyone else. (Petition 4, Doc. 4-1, at 41). King further had Simmonds ask a series of questions of the DHO on his behalf at the hearing. (Petition 4, Doc. 4-1, at 42). King did not present any other witnesses. (Petition 4, Doc. 4-1, at 42).

In addition to the statements from King and Simmonds, the DHO also considered the following documentary evidence: a photocopy of the letter in question; a memorandum provided by Counselor R. Bingaman; and a photocopy of an informal resolution attempt from just weeks before the incident in question occurred, in which King sought to have SIA S. Heath prohibited from monitoring his mail. (Petition 4, Doc. 4-1, at 42). After reviewing all the evidence, the DHO found that King violated Codes 299/203 "Conduct which disrupts or interferes with the security or orderly running of the institution most like threatening another with bodily harm" and Code 296 "Use of the mail to commit or further a high category prohibited act."[7] (Petition 4, Doc. 4-1, at 43). In reaching this conclusion, the DHO assigned

---

[7] A Code 299 charge is appropriate "when another charge of high severity is not accurate. The offending conduct must be charged as 'most like' one of the listed High severity prohibited acts." 28 C.F.R. § 541.3, Table 1.

greater evidentiary weight to SIA S. Heath's incident report and the original letter than to King's explanation as to why his letter should be deemed harmless. (Petition 4, Doc. 4-1, at 44). The DHO reasoned that King's explanation at the hearing was less credible because King knew that his outgoing mail would be screened and thus likely knew to include a reference to taking legal action in the letter specifically so that he could rebut any accusation that he was threatening physical harm. (Petition 4, Doc. 4-1, at 45-46). Furthermore, because King knew that the letter would be screened and also was aware of the relationship between SIA S. Heath and SIA C. Heath, King could anticipate that the "story" he included in his letter about surveilling and destroying the property of a BCI officer with the help of his "resources" in the community would have the intended effect of striking fear in the Heaths. (Petition 4, Doc. 4-1, at 45-46). The DHO also dismissed King's contention that SIA S. Heath's incident report was somehow fraudulent or retaliatory, given that the incident report was derived directly from King's letter, the authenticity of which is undisputed. (Petition 4, Doc. 4-1, at 46).   The following sanctions were imposed on King by the DHO: (1) disallowance of 54 days good conduct time (27 days each for the Code 299/203 violation and for the Code 296 violation); (2) forfeiture of 21 days non-vested good conduct time (for the Code 299/203 violation); (3) 30 days disciplinary segregation (for the Code 299/203 violation); (4) 180 days loss of email and telephone privileges (for the Code 299/203 violation); and (5) 180 days loss of visitation privileges (for the Code 296 violation). (Petition 4, Doc. 4-1, at 46). The DHO's written decision was issued on December 21, 2015, and King received a copy of the report and was advised of his appeal rights the same day. (Petition 4, Doc. 4-1, at 47).

King filed an appeal of the DHO's decision to the Regional Director on January 28, 2016, Administrative Remedy Identification No. 850438-R1. (Petition 4, Doc. 1, at 2; Petition

4, Doc. 5, at 12). King alleges that this appeal was rejected on February 2, 2016 because he failed to include a copy of the DHO report, which he repeatedly requested from the DHO but never received. (Petition 4, Doc. 1, at 11). Respondent counters that King's appeal was rejected because he failed to include the proper number of continuation pages and because the appeal was untimely, rather than for failing to include the DHO report. (Petition 4, Doc. 4, at 4-5 & n.2; Petition 4, Doc. 4-1, at 27). Respondent further states that King was permitted to resubmit his appeal to the Regional Director within 10 days, along with an explanation for his delay in filing. (Petition 4, Doc. 4, at 4-5; Petition 4, Doc. 5, at 24). Rather than resubmitting his appeal to the Regional Director as instructed, King filed an appeal to the Central Office on February 12, 2016, Administrative Remedy Identification No. 850438-A1. (Petition 4, Doc. 1, at 3; Petition 4, Doc. 5, at 25). The Central Office rejected this appeal on March 28, 2016, noting that King instead should have filed his appeal with the Regional Director. (Petition 4, Doc. 1, at 3; Petition 4, Doc. 5, at 26). It does not appear that King filed any further appeals with regard to this incident report. *See* (Petition 4, Doc. 4-1, at 27-34). Instead, King filed the instant habeas petition, 3: 16-CV-01863, which was received and filed by this Court on September 9, 2016. (Petition 4, Doc. 1).

## II.   LEGAL STANDARD

Under § 2241, a federal inmate may challenge the execution of his sentence—such as the loss of good-time credits—in the district court for the federal judicial district where the inmate is in custody. *See* 28 U.S.C. § 2241(a); *Rumsfeld v. Padilla*, 542 U.S. 426, 443–44 (2004); *Coady v. Vaughn*, 251 F.3d 480, 485 (3d Cir. 2001). Ordinarily, however, a federal inmate must properly exhaust his administrative remedies before filing a petition for writ of habeas corpus pursuant to § 2241. *Moscato v. Fed. Bureau of Prisons*, 98 F.3d 757, 760 (3d Cir. 1996). This "proper"

exhaustion requirement means that "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court . . . ." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006).

The BOP has established regulations for inmate disciplinary proceedings. 28 C.F.R. § 541.5 *et seq*. Upon belief that an inmate committed a prohibited act, a staff member initiates disciplinary proceedings by issuing an incident report and commencing an investigation. 28 C.F.R. § 541.5(a). The incident report is then forwarded to the UDC for review, and the UDC either refers the case to the DHO for a further hearing, or—if the allegations are lower-level Code violations—may adjudicate the matter itself. 28 C.F.R. § 541.7. The DHO may dismiss any charge, determine that the inmate committed the prohibited act and impose any available sanction for the act, or remand the incident report if it finds that further investigation and review is needed. 28 C.F.R. § 541.8. The DHO must prepare a written report that is distributed to the inmate and details:

> (1) Whether [the inmate was] advised of [the inmate's] rights during the DHO process;
> (2) The evidence relied on by the DHO;
> (3) The DHO's decision;
> (4) The sanction imposed by the DHO; and
> (5) The reason(s) for the sanction(s) imposed.

28 C.F.R. § 541.8(h).

Under the BOP's administrative remedy program, the first level appeal from a DHO decision is an appeal to the Regional Director. 28 C.F.R. § 542.14(d)(2); *see also* 28 C.F.R. § 541.8(i). An inmate may appeal a DHO's decision by submitting the appropriate form to the Regional Director within twenty calendar days from the date the inmate receives the DHO report. *See* 28 C.F.R. § 542.15(a); *see also* 28 C.F.R. § 542.14(d)(2). An inmate who is not satisfied with the Regional Director's response may further appeal by submitting the appropriate

form to the General Counsel at the BOP's Central Office within thirty calendar days from the date the Regional Director signed the response. 28 C.F.R § 542.15(a). This appeal to the General Counsel is the final step in the administrative appeals process for disciplinary decisions. *See* 28 C.F.R. § 542.15(a) ("Appeal to the General Counsel is the final administrative appeal."). The coordinator at any administrative level may reject an appeal that does not meet the requirements of these guidelines, and must provide a written explanation for the rejection. 28 C.F.R. § 542.17. If the defect is correctable, however, the coordinator shall grant leave for the inmate to correct the defect and resubmit the appeal. 28 C.F.R. § 542.17(b). If the defect is not deemed correctable and the inmate therefore is not given an opportunity to resubmit, that inmate may appeal the rejection to the next level. 28 C.F.R. § 542.17(c).

"Federal prisoners have a liberty interest in statutory good time credits." *Williams v. Werlinger*, 451 F. App'x 127, 129 (3d Cir. 2011) (not precedential). That interest is limited, however, because "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). Thus, "[w]here a prison disciplinary hearing may result in the loss of good time credits, . . . an inmate must receive: (1) advance written notice of the disciplinary charges; (2) an opportunity . . . to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Superintendent v. Hill*, 472 U.S. 445, 454 (1985) (citing *Wolff,* 418 U.S. at 563–67). The DHO decision also must be supported by some evidence in the record. *Hill*, 472 U.S. at 454. This threshold is a low one, however, as "the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Hill,* 472 U.S. at 455-56. Accordingly, the scope of judicial review of BOP

disciplinary decisions is limited to confirming that the inmate was afforded the minimum procedural due process rights and that there was "some evidence" to support the DHO's conclusions. *See Hill, 472 U.S. at 457.*

## III.   DISCUSSION

### A.   PETITIONS 3 AND 4 SHOULD BE DISMISSED AS PROCEDURALLY DEFAULTED

Respondent argues that Petitions 3 and 4 are subject to dismissal because King failed to properly exhaust his available administrative remedies before initiating each petition. (Petition 3, Doc. 4, at 5-7; Petition 4, Doc. 4, at 13-16). Although § 2241 does not explicitly require exhaustion on the face of the statute itself, the United States Court of Appeals for the Third Circuit has consistently held that inmates must exhaust procedural remedies before bringing a federal habeas claim. *Speight v. Minor,* 245 F. App'x 213, 215 (3d Cir. 2007) (not precedential); *Callwood v. Enos,* 230 F.3d 627, 634 (3d Cir. 2000); *Moscato,* 98 F.3d at 760. In *Moscato,* the Third Circuit explained that exhaustion serves three valuable purposes: "(1) allowing the appropriate agency to develop a factual record and apply its expertise facilitates judicial review; (2) permitting agencies to grant the relief requested conserves judicial resources; and (3) providing agencies the opportunity to correct their own errors fosters administrative autonomy." 98 F.3d at 761-62. An inmate's failure to exhaust administrative remedies may be excused, however, where the inmate can show that there was no opportunity to obtain adequate redress or that exhaustion would be futile. *Moscato,* 98 F.3d at 762; *Azzara v. Martinez,* No. 4:CV-11-1363, 2014 WL 2180163, at *6 (M.D. Pa. May 23, 2014).

King therefore needed to satisfy the procedural requirements of the BOP administrative remedy program in order to properly exhaust the claims in each of his petitions. *See Moscato,* 98 F.3d at 761 ("[A] procedural default in the administrative process bars judicial review because

'the reasons for requiring that prisoners challenging disciplinary actions exhaust their administrative remedies are analogous to the reasons for requiring that they exhaust their judicial remedies before challenging their convictions . . . .'" (quoting *Sanchez v. Miller*, 792 F.2d 694, 698 (7th Cir. 1986)). Since his designation to BOP custody in September of 2010, King has filed at least 67 administrative remedies. *See* (Petition 4, Doc. 4-1, at 3-34). Many of those remedies pertain to the four incident reports that are the subject of the petitions now before this Court.

### 1.  Petition 3

With respect to the incident report at issue in Petition 3 (No. 2664375), King filed a timely appeal to the Regional Director, Administrative Remedy No. 809782-R1, on January 21, 2015. (Petition 3, Doc. 1, at 2, 15). King's appeal to the Regional Director was denied on March 4, 2015. (Petition 3, Doc. 1, at 15). King then had thirty calendar days to file an appeal of the Regional Director's denial with the Central Office. *See* 28 C.F.R. § 542.15(a) ("An inmate who is not satisfied with the Regional Director's response may submit an Appeal on the appropriate form (BP–11) to the General Counsel within 30 calendar days of the date the Regional Director signed the response."). King failed to meet this deadline, however, as he did not file an appeal to the Central Office until September 9, 2015, Administrative Remedy Identification No. 809782-A1, over six months after the Regional Director denied his initial appeal. (Petition 3, Doc. 1, at 3; Petition 3, Doc. 5, at 22-23). On October 7, 2015, the Central Office rejected King's appeal because he failed to attach copies of his appeal to the Regional Director and the Regional Director's response. (Petition 3, Doc. 1, at 17; Petition 3, Doc. 5, at 24). Nonetheless, King was given 15 days to resubmit his appeal to the Central Office with the requested documentation included. (Petition 3, Doc. 1, at 17). King resubmitted his appeal to

the Central Office on October 19, 2015, Administrative Remedy Identification No. 809782-A2, urging the Central Office to consider his appeal on the merits "[i]nstead of looking for reasons to deny [it]." (Petition 3, Doc. 4-1, at 22; Petition 3, Doc. 5, at 25). The Central Office rejected King's resubmitted appeal on November 12, 2015, finding that King again failed to include the requested documentation and also that the appeal was untimely. (Petition 3, Doc. 4-1, at 22; Petition 3, Doc. 5, at 26). The Central Office once again gave King the chance to resubmit his appeal, along with an explanation of why the untimely filing was not his fault. (Petition 3, Doc. 5, at 26). However, King never resubmitted the appeal with an explanation for his untimeliness, as instructed. (Petition 3, Doc. 4-1, at 22-32).

Respondent contends that Petition 3 should be dismissed for failure to properly exhaust administrative remedies because King's appeal to the Central Office was untimely. (Petition 3, Doc. 4, at 7); *see also* 28 C.F.R. § 542.15(a). In support of this argument, Respondent submits a declaration under penalty of perjury from BOP Supervisory Attorney L. Cunningham and a copy of King's complete BOP administrative remedy filing history. (Petition 3, Doc. 4-1, at 3-32); *see, e.g.*, *Moscato,* 98 F.3d at 760 (holding that petitioner committed a procedural default by failing to satisfy the BOP's procedural rules where petitioner filed an appeal to the Central Office 16 days after the 30 day deadline). King counters that he could not file a timely appeal to the Central Office because he never received the Regional Director's denial. (Petition 3, Doc. 1, at 2, 16). Specifically, King notes that he was in the process of being transferred from USP Allenwood to USP Lewisburg at the time the Regional Director denied his appeal, and that he made numerous unsuccessful attempts to contact the Regional Director and obtain a copy of the appeal denial. (Petition 3, Doc. 5, at 2).

This Court finds King's argument to be unavailing. BOP regulations provide that "[i]f

the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level." 28 C.F.R. § 542.18. Therefore, even if King never received the denial of his appeal from the Regional Director, he could have moved forward with an appeal to the Central Office after March 7, 2015, once the time allotted for the Regional Director's reply had elapsed. (Petition 3, Doc. 1, at 15); *see also* 28 C.F.R. § 542.18. Because the lack of a timely response from the Regional Director may be deemed a denial, King then would have had 30 calendar days from March 7, 2015 to file his appeal to the Central Office. *See* 28 C.F.R. § 542.15(a). Here, however, King did not submit his appeal to the Central Office until September 9, 2015, over five months after the deadline had passed. (Petition 3, Doc. 1, at 3; Petition 3, Doc. 5, at 22-23). King's contention that he never received the Regional Director's denial of his original appeal simply does not excuse King's months-long delay in filing his appeal to the Central Office. *See Woodford v. Ngo,* 548 U.S. 81, 88 ("[A] prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court.").

Even though King's appeal to the Central Office was untimely, it did not necessarily need to be fatal to his efforts to exhaust administrative remedies. Indeed, the BOP's regulations provide that "[i]f the defect on which the rejection is based is correctable, the [rejection] notice shall inform the inmate of a reasonable time extension within which to correct the defect and resubmit the Request or Appeal." 28 C.F.R. § 542.17(b). Here, it is clear that the Central Office found the defects in King's appeals to be potentially curable, as the Central Office twice instructed King to resubmit his appeal along with certain requested additional materials. (Petition 3, Doc. 1, at 17; Petition 3, Doc. 5, at 26). Most significantly, in its rejection dated

November 12, 2015, the Central Office directed King to submit documentation as to why he was not at fault for the untimely filing. (Petition 3, Doc. 5, at 26). King ignored these instructions, and never submitted an explanation to the Central Office as to why his appeal should not be considered untimely. Moreover, the BOP's administrative remedy procedure only permits an inmate to proceed to the next level of review where the inmate is not given an opportunity to correct the defect in a rejected appeal. *See* 28 C.F.R. § 542.17(c). Because King spurned the Central Office's invitation to correct the defects in his appeals by resubmitting them with supporting documentation, King never properly completed exhaustion at the Central Office level. Accordingly, King procedurally defaulted on his claim with respect to Petition 3.

Notwithstanding the procedural default, King's failure to exhaust may be excused by establishing cause for the default and prejudice from the alleged violation of his rights. *Moscato, 98 F.3d at 762.* "Cause is generally only established where the petitioner shows that 'some external objective factor impeded' his or her efforts to comply with the [BOP]'s administrative remedy provisions." *Spencer v. Thomas,* No. 1:14–CV–01177, 2015 WL 2356891, at *4 (M.D. Pa. May 15, 2015) (quoting *Murray v. Carrier,* 477 U.S. 478, 488 (1986)). In attempting to excuse his procedural default, King only presents a single argument that is pertinent to Petition 3, namely, that King was impeded from filing a timely appeal to the Central Office because the Regional Director never provided him with a denial of his initial appeal.[8] (Petition 3, Doc. 5, at 2-3). However, the BOP's own regulations belie King's claim because inmates are permitted to proceed to the Central Office level in the event that the Regional Director fails to timely

---

[8] King cites additional instances of alleged malfeasance on the part of the BOP that are pertinent to other administrative appeals but not at issue in Petition 3 and irrelevant for the purpose of establishing cause to excuse his procedural default here. *See* (Petition 3, Doc. 5, at 3-4).

respond to an initial appeal. 28 C.F.R. § 542.18. Moreover, even if King could establish that not receiving the Regional Director's denial could potentially constitute cause to excuse a procedural default, he cannot show that this was fatal to his exhaustion efforts. Indeed, the Central Office explicitly granted King the chance to explain why he was not at fault for the untimeliness of his appeal, thus indicating that it was willing to consider the merits of King's appeal in spite of its untimeliness. (Petition 3, Doc. 5, at 26). King's procedural default was ultimately caused by his failure to avail himself of this opportunity, rather than any untimeliness due to not receiving the Regional Director's denial. Accordingly, the Court recommends dismissal of Petition 3 because King failed to properly exhaust his claim and cannot establish that his procedural default should be excused.

### 2. Petition 4

With respect to the incident report at issue in Petition 4 (No. 2785471), King filed an appeal to the Regional Director, Administrative Remedy No. 850438-R1, on January 28, 2016. (Petition 4, Doc. 1, at 2; Petition 4, Doc. 5, at 12). On February 2, 2016, the Regional Director rejected King's appeal because King failed to include the proper amount of continuation pages and because the appeal was untimely. (Petition 4, Doc. 4, at 4-5 & n.2; Petition 4, Doc. 4-1, at 27); Petition 4, Doc. 5, at 24). The Regional Director permitted King to resubmit his appeal within 10 days, along with an explanation from a staff member for his delay in filing. (Petition 4, Doc. 4, at 4-5; Petition 4, Doc. 5, at 24; Petition 4, Doc. 5, at 24). However, rather than resubmitting his appeal to the Regional Director as instructed, King filed an appeal to the Central Office on February 12, 2016, Administrative Remedy Identification No. 850438-A1. (Petition 4, Doc. 1, at 3; Petition 4, Doc. 5, at 25). The Central Office rejected this appeal on March 28, 2016, noting that King should have filed his appeal with the Regional Director and

directing King to follow the Regional Director's original instructions. (Petition 4, Doc. 1, at 3; Petition 4, Doc. 5, at 26). Rather than comply with the Regional Director and Central Office's instructions, however, King chose not to file any further appeals with regard to this incident report. *See* (Petition 4, Doc. 4-1, at 27-34).

Respondent contends that Petition 4 should be dismissed for failure to properly exhaust administrative remedies because King never filed an appeal to the Regional Director that conformed to BOP regulations. (Petition 4, Doc. 4, at 14-16). In support of this argument, Respondent submits a declaration under penalty of perjury from BOP Attorney Advisor Jennifer Knepper, a copy of King's complete BOP administrative remedy filing history, a copy of the incident report (No. 2785471), and a copy of the DHO report. (Petition 4, Doc. 4-1, at 3-47). King counters that he could not file an appeal to the Regional Director that was compliant with BOP regulations because he never received a copy of the DHO report and because USP Lewisburg staff were unwilling to make copies of the documentation he was required to include with his appeal. (Petition 4, Doc. 5, at 1-3). However, Respondent includes in his response to Petition 4 a copy of the DHO report that was signed and dated by USP Lewisburg staff member S. Flowers on December 21, 2015, indicating that King was provided a copy of the DHO report and advised of his appeal rights on that day. (Petition 4, Doc. 4-1, at 47). King alleges that Flowers's statement is fraudulent and maintains that he never saw the DHO report until it was included in Respondent's response to Petition 4. (Petition 4, Doc. 5, at 4).

This Court agrees with Respondent that King failed to comply with the BOP's administrative remedy procedure with respect to the incident report at issue in Petition 4. The Regional Director rejected King's initial appeal because it was untimely and because King failed to include the proper amount of continuation pages. (Petition 4, Doc. 4, at 4-5 & n.2;

Petition 4, Doc. 4-1, at 27; Petition 4, Doc. 5, at 24); *see also* 28 C.F.R. § 542.15(a), (b)(3) (providing that inmates must submit an appeal to the Regional Director within twenty calendar days of the institutional-level decision and that inmates must provide two additional copies of any continuation page and exhibits, respectively). However, the Regional Director found the defects in King's appeal to be correctable, and instructed King to resubmit his appeal within 10 days in its proper form and with a memorandum from a staff member explaining why King was not at fault for the untimeliness. *Compare* 28 C.F.R. § 542.17(b) ("If the defect on which the rejection is based is correctable, the notice shall inform the inmate of a reasonable time extension within which to correct the defect and resubmit the Request or Appeal."), *with* § 542.17(c) ("When a Request or Appeal is rejected and the inmate is not given an opportunity to correct the defect and resubmit, the inmate may appeal the rejection . . . to the next appeal level."). King never resubmitted his appeal to the Regional Director as instructed, and instead appealed to the Central Office. (Petition 4, Doc. 1, at 3; Petition 4, Doc. 5, at 25). Because the appeal was never corrected and resubmitted to the Regional Director, it was not properly exhausted at the regional level. *See Woodford*, 548 U.S. at 88. Indeed, the BOP's administrative remedy procedure only permits an inmate to appeal the Regional Director's rejection to the next level where the inmate is not given an opportunity to correct the defect. *See* 28 C.F.R. § 542.17(c). Here, however, King was provided the opportunity to correct the defects in his appeal to the Regional Director, so he therefore was not entitled to proceed to the Central Office. Accordingly, the Court finds that King procedurally defaulted on his claim that forms the basis of Petition 4.

King also fails to establish cause and prejudice to excuse his procedural default. King attempts to blame his procedural default on not receiving the DHO report and on the refusal of

USP Lewisburg staff members make copies of the documents he needed to include with his appeal. (Petition 4, Doc. 5, at 1-3). However, King's explanation does nothing to address why he failed to resubmit his appeal to the Regional Director with a statement from a staff member, as instructed. Indeed, King does not provide any reason as to why he ignored the directions of the Regional Director and Central Office to submit a second comprehensive appeal with the Regional Director. (Petition 4, Doc. 5, at 24, 26). Respondent makes clear that it was this failure to resubmit a proper appeal to the Regional Director—not the deficiencies in his initial appeal—that ultimately caused King's procedural default. (Petition 4, Doc. 4, at 16). As King "fails to allege the existence of an external impediment" that prevented him from resubmitting a comprehensive appeal to the Regional Director, he cannot establish cause for his procedural default. *Moscato*, 98 F.3d at 762. Accordingly, the Court recommends dismissal of Petition 4 because King failed to properly exhaust his claim and cannot establish that his procedural default should be excused.

B.   PETITIONS 1 AND 2 FAIL ON THE MERITS

Respondent concedes that King's claims that form the basis of Petitions 1 and 2 were properly exhausted, but nonetheless contends that the petitions lack merit because King was provided all procedural requirements established in *Wolff* and *Hill*.

**1. King received sufficient Procedural Due Process with respect to the Code 296 violation at issue in Petition 1**

King claims that he was denied procedural due process at the DHO hearing for Incident Report No. 2690426 because he was found guilty of violating Code 296 without receiving an opportunity to prepare a defense against this particular charge. (Petition 1, Doc. 1, ¶ 13). As noted above, inmates are entitled to certain procedural safeguards when charged with misconduct as part of a prison disciplinary proceeding, including: "(1) advance written notice of

the disciplinary charges; (2) an opportunity . . . to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Superintendent v. Hill*, 472 U.S. 445, 454 (1985) (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-67 (1974)). King argues that he was denied these due process protections with respect to the Code 296 violation because he had been told that he would face a Code 203 charge, instead. (Petition 1, Doc. 1, ¶ 13). Respondent, on the other hand, argues that the DHO did not violate King's procedural due process rights by charging him with a Code 203 violation and then ultimately finding that King's misconduct is best characterized as a Code 296 violation. (Petition 1, Doc. 15, at 9).

> BOP regulations provide, in relevant part:
>
> The DHO will make one of the following decisions after a hearing on the incident report:
> (1) You committed the prohibited act(s) charged, *and/or a similar prohibited act(s) as described in the incident repor*t;
> (2) You did not commit the prohibited act(s) charged; or
> (3) The incident report will be referred back for further investigation, review, and disposition.

28 C.F.R. § 541.8(a) (emphasis added).

Respondent contends that King received all requisite procedural due process because the Code 296 charge was sufficiently similar to a Code 203 charge, and because the underlying facts for the Code 296 violation were described in the incident report. (Petition 1, Doc. 15, at 10).

This Court agrees with Respondent that the DHO's procedures conformed to both BOP regulations and constitutional due process requirements. Several courts within the Third Circuit have considered and rejected King's argument that procedural due process is violated whenever the DHO finds an inmate guilty of an act that the inmate was not originally charged with. *See Guerrero v. Recktenwald*, 542 F. App'x 161, 164 (3d Cir. 2013) (not precedential) ("[T]hat the

notice of the disciplinary hearing did not explicitly charge [the petitioner] with insolence is of no consequence because pursuant to 28 C.F.R. § 541.8(a)(1), a DHO has the authority to find that an inmate 'committed the prohibited act(s) charged, and/or a similar prohibited act(s) as described in the incident report.'"); *Milhouse v. Ebbert*, No. 1:15-CV-00013, 2016 WL 4448637, at *3 n.4 (M.D. Pa. Aug. 24, 2016) (holding that petitioner received sufficient due process because "the facts relating to the prohibited acts charged and those of which the DHO found [petitioner] guilty remained the same"); *Sanders v. Zickefoose*, No. 1:13-CV-1595, 2015 WL 4729831, at *8 (M.D. Pa. Aug. 10, 2015) ("When read in connection with *Wolff's* notice requirement, this Court has not hesitated to find that 28 C.F.R. § 541.8(f) authorizes a DHO to change, or amend, the misconduct charges on an incident report to conform to the charges which the evidence at a hearing later proves an inmate actually committed."); *Thornton v. Thomas*, No. 3:CV-12-1264, 2013 WL 6858741, at *5 (M.D. Pa. Dec. 30, 2013) ("To the extent Petitioner argues that the DHO found him guilty of Fighting, an act, he claims he was not originally charged with, BOP policy as codified at 28 C.F.R § 541.8(a)(1) provides that the DHO may find that an inmate 'committed the prohibited act(s) charged, and/or a similar prohibited act(s) as described in the incident report.'"). "[H]owever, in order for a DHO to constitutionally change, or amend, a misconduct charge, after an inmate has been provided with a copy of the incident report, without the need to provide additional advance-written notice, the factual nature of the alleged prohibited conduct must remain the same." *Sanders*, 2015 WL 4729831, at *8. Here, the Court finds that King possessed all the information he needed to defend against the amended charge of a Code 296 violation because the DHO relied on facts that were contained in the incident report. Indeed, the incident report specifically noted that King "uses coded messages" in his outgoing letters. (Petition 1, Doc. 1-1, at 1). Thus, the

factual nature of the alleged prohibited conduct did not change, despite the DHO's determination that King's misconduct was best characterized as a Code 296 violation.

In addition to failing to establish that the factual nature of the Code 203 and Code 296 charges were different, King also does not explain how he was prejudiced by the DHO's determination that King committed a similar prohibited act to the one initially charged. *See Von Kahl v. Brennan*, 855 F. Supp. 1413, 1422 (M.D. Pa. 1994) ("[T]his court is reluctant to overtax and/or hamstring prison officials' execution of disciplinary policies and procedures by mandating an automatic remand for technical non-compliance with a regulation, absent some showing of prejudice to the inmate."). For instance, although King maintains that he was denied the opportunity to present witnesses as to the Code 296 charge, he fails to state who he would have called or what any witnesses could have testified to in his defense. (Petition 1, Doc. 1, ¶ 13). Likewise, King does not specify any new evidence that he would have presented at the DHO hearing had he known that he would be charged with a Code 296 violation. This Court therefore recommends that King's procedural due process claim with respect to the incident report at issue in Petition 1 be denied because the initial and amended charges share the same factual basis and because King fails to establish that any prejudice resulted from the amendment to the charge.[9] *See Fenner*, 2014 WL 5511395, at *3 ("Even if BOP regulations warranted the rewriting of the charge, absent a showing of prejudice, a technical violation of BOP regulations does not automatically require that a disciplinary sanction must be vacated and remanded.").

---

[9] The Court also does not find prejudice because the initial Code 203 charge and the amended Code 296 charge are both categorized as "High Severity Level Prohibited Acts" and thus carried the same potential sanctions. *See* 28 C.F.R § 541.3, Tables 1 and 2; *see also Fenner v. Ebbert*, No. 4:CV-13-1245, 2014 WL 5511395, at *3 (M.D. Pa. Oct. 31, 2014) (denying petitioner's procedural due process claim and noting that "this is not a case where a prisoner was found guilty of a greater offense than the one originally charged").

### 2. There is evidence in the record to support the DHO's finding that King committed the Code 111 violation at issue in Petition 2

King argues that the Code 111 violation at issue in Petition 2 should be overturned because he "proved beyond any doubt that there was no evidence that [he] sold suboxone, or any other drug, to any inmate." (Petition 2, Doc. 1, at 10). Specifically, King claims that he rebutted or presented contradictory evidence to undermine all of the evidence that the DHO relied on in concluding that King committed the prohibited act. (Petition 2, Doc. 1, at 6-10). King's argument falls short, however, as his challenges to the credibility of the evidence the DHO relied upon fail to disprove the existence of any such evidence whatsoever.[10]

The record reflects that the DHO met the requisite evidentiary standard in determining that Petitioner committed the Code 111 violation. As noted above, even "meager" evidentiary support is sufficient to sustain the result of a prison disciplinary proceeding on federal habeas review. *Williams v. Werlinger*, 451 F. App'x 127, 130 (3d Cir. 2011) (not precedential) (citing *Hill*, 472 U.S. at 456-57). "The 'some evidence' standard does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." *Speight v. Minor*, 245 F. App'x 213, 216 (3d Cir. 2007) (not precedential). Thus, "[t]he sufficiency standard is met where a DHO supports a finding of culpability solely by reference to an incident report compiled by a corrections officer." *Moles v. Holt*, 221 F. App'x 92, 94 (3d Cir. 2007) (not precedential); *see also Speight*, 245 F. App'x at 217 ("[T]he disciplinary hearing record, specifically the charging officer's report, although meager, constitutes some evidence supporting the DHO's decision in [petitioner]'s case."). Here, the DHO had

---

[10] King does not claim that he was deprived of any of the other procedural safeguards that he complains of in Petition 1.

considerable additional evidence beyond the incident report to support his conclusion that King committed the prohibited act. For instance, the DHO considered the memorandums provided by prison staff members F. Ortiz and M. Butler, who tested the intercepted mail and confirmed that the contents contained the drug Suboxone. (Petition 2, Doc. 1, at 15). The DHO also considered the investigative report by SIA C. Heath, including Heath's interview of Laubach in which Laubach allegedly admitted that she sent and received the envelopes on King's behalf. (Petition 2, Doc. 1, at 15-16). Finally, the DHO even had documentary evidence in the form of photocopies of the money orders in Biedrzycki's name. (Petition 2, Doc. 1, at 14). The record reveals the existence of specific documentary evidence that clearly exceeds the "some evidence" standard. To the extent that King challenges the DHO's credibility determinations regarding that evidence and puts forth new evidence in support of his innocence of the charge, it is simply not the role of this Court to "re-weigh evidence or make credibility assessments in determining whether the 'some evidence' standard is met . . . ." *Werlinger*, 451 F. App'x at 130. Because this Court concludes that there was "some evidence" in the record to support the DHO's decision, it is respectfully recommended that Petition 2 be denied.

### C.   MOTIONS FOR DISCOVERY

As a final matter, the Court addresses the motions for discovery King filed in Petitions 1 and 2. (Petition 1, Doc. 9; Petition 2, Doc. 4). In both motions, King seeks to re-litigate and expand upon the record presented at his DHO hearings by challenging certain evidence and using proposed interrogatories to cross-examine witnesses. (Petition 1, Doc. 9; Petition 2, Doc. 4). Rule 6(a) of the Rules Governing Section 2254 Cases provides that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and

may limit the extent of discovery."[11] Rule 6, 28 U.S.C. foll. § 2254. Good cause is established "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief . . . ." *Harris v. Nelson*, 394 U.S. 286, 300 (1969). Thus, "[h]abeas petitioners have no absolute right to make discovery demands upon respondents. Rather, decisions on discovery requests rest in the sound discretion of the court." *Selby v. Scism*, No. 3:10-CV-1554, 2010 WL 3069580, at *4 (M.D. Pa. Aug. 2, 2010).

Here, the Court finds that King's requested discovery is unwarranted. Federal habeas courts assume an inherently limited role in the review of BOP inmate disciplinary proceedings. *Superintendent v. Hill*, 472 U.S. 445, 457 (1985) Specifically, as discussed above, federal courts may inquire into two narrow areas: (1) whether the inmate was afforded certain minimum procedural due process protections, and (2) whether there was "some evidence" to support the DHO's conclusion that the inmate committed the prohibited act. *See Hill*, 472 U.S. at 457. The discovery that King seeks in Petitions 1 and 2 is not probative of either of these two issues, and therefore falls outside the Court's scope of review. *See United States v. Purcell*, 667 F. Supp. 2d 498, 518 (E.D. Pa. 2009) ("In the habeas context, courts have denied discovery requests on the ground that the defendant failed to make a showing that the materials requested would contain relevant evidence."), *aff'd*, 517 F. App'x 79 (3d Cir. 2013) (not precedential); *see also United States v. Wilson*, 901 F.2d 378, 382 (4th Cir. 1990) (affirming denial of discovery request because "[i]t was reasonable for [the judge] to conclude that the requested discovery, if granted, would add little or nothing to the proceedings"). Moreover, King's extensive requested discovery is

---

[11] The Court exercises its discretion to apply the Rules Governing Section 2254 Cases to this section 2241 habeas case. *See* Rule 1, 28 U.S.C. foll. § 2254.

unnecessary and unwarranted, given that this Court has already found that his claims fail on the merits and that King does not present specific allegations that could potentially demonstrate his entitlement to relief. Accordingly, the Court recommends that King's motions for discovery be denied. (Petition 1, Doc. 9; Petition 2, Doc. 4).

## IV.    RECOMMENDATION

Based on the foregoing, it is recommended that King's Petition for Writ of Habeas Corpus Docket Nos. 3:15-CV-01937 (Petition 1, Doc. 1), 3:15-CV-02483 (Petition 2, Doc. 1), 3:16-CV-00953 (Petition 3, Doc. 1), and 3:16-CV-01863 (Petition 4, Doc. 1) each be **DENIED** and **DISMISSED WITH PREJUDICE**. It is further recommended that the Court decline to issue a certificate of appealability, as King has failed to demonstrate "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Miller-El v. Cockrell*, 537 U.S. 322, 335–36 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). As a final matter, the Court recommends that King's two motions for discovery (Petition 1, Doc. 9; Petition 2, Doc. 4) also be **DENIED**.

Dated: November 28, 2016

*s/ Karoline Mehalchick*

**KAROLINE MEHALCHICK**
**United States Magistrate Judge**

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAMES KING, | |
| Petitioner, | CIVIL ACTION NO. 3:15-CV-01937 |
| v. | (NEALON, J.) |
| WARDEN DAVID EBBERT, | (MEHALCHICK, M.J.) |
| Respondent. | |
| JAMES KING, | |
| Petitioner, | CIVIL ACTION NO. 3:15-CV-02483 |
| v. | (NEALON, J.) |
| WARDEN DAVID EBBERT, | (MEHALCHICK, M.J.) |
| Respondent. | |
| JAMES KING, | |
| Petitioner, | CIVIL ACTION NO. 3:16-CV-00953 |
| v. | (NEALON, J.) |
| WARDEN DAVID EBBERT, | (MEHALCHICK, M.J.) |
| Respondent. | |
| JAMES KING, | |
| Petitioner, | CIVIL ACTION NO. 3:16-CV-01863 |
| v. | (NEALON, J.) |
| WARDEN DAVID EBBERT, | (MEHALCHICK, M.J.) |
| Respondent. | |

## NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing **Report and Recommendation** dated **November 28, 2016.** Any party may obtain a review of the Report and Recommendation pursuant to Rule 72.3, which provides:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

**Dated: November 28, 2016**                     *s/ Karoline Mehalchick*
                                                 **KAROLINE MEHALCHICK**
                                                 **United States Magistrate Judge**